UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

STEPHEN OLUSEGUN
BANJOKO,

         Case No. 2:26-cv-58-KCD-DNF

        Petitioner,

   v.

KEVIN J. RAMBOSK, *et al.*;

        Respondents.

_____/

## <u>ORDER</u>

Petitioner Stephen Olusegun Banjoko is a Nigerian citizen subject to a final order of removal. But for more than a decade, he lived freely in the United States under an order of supervision—essentially a form of immigration parole where he checked in with the government but otherwise lived his life. That arrangement came to an abrupt halt on December 18, 2025. (Doc. 1 ¶ 22.)[1] When Banjoko showed up for what he thought was a routine check-in, Immigration and Customs Enforcement ("ICE") took him into custody. The very next day, the agency formally revoked his supervision. Banjoko has now filed this habeas action, asking the Court to declare his sudden confinement unlawful and order his immediate return to supervised release. (*Id.* at 42-43.)

---

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

Banjoko raises a mix of constitutional and administrative claims. Some hit the mark; most do not. While immediate release is off the table, Banjoko is fully entitled to the procedural protections the Government promised but failed to deliver. Rather than recite his lengthy immigration history upfront, the relevant facts will unfold as needed alongside the analysis below.

## I. Legal Framework

The federal habeas statute, 28 U.S.C. § 2241, provides authority to issue writs of habeas corpus when an individual is "[i]n custody in violation of the Constitution or law or treaties of the United States." *Id.* § 2241(c)(3). "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001). "Section 2241 authorizes federal courts to hear challenges to immigration detention." *Grigorian v. Bondi*, No. 25-CV-22914-RAR, 2025 WL 2604573, at *2 (S.D. Fla. Sept. 9, 2025).

## II. Discussion

The Government first claims that two provisions of the Immigration and Nationality Act—8 U.S.C. § 1252(g) and § 1252(b)(9)—strip this Court of jurisdiction. (Doc. 9 at 4-7.) The basic argument goes like this: Banjoko is being detained so he can be removed; therefore, his lawsuit arises from the "execution" of a removal order, and Congress has said district courts cannot

2

touch that. (*Id.* at 5.) Despite the superficial appeal, this reading of the INA is too broad. It treats the INA's jurisdiction-stripping provisions like a black hole, sucking in any claim that has even a tangential relationship to a removal order. Yet the Supreme Court has told us to read these statutes much more narrowly. *See Jennings v. Rodriguez*, 583 U.S. 281, 292-96 (2018).

Turning first to § 1252(g), it says that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." *Id.* This provision "limits habeas corpus jurisdiction, including under § 2241." *Islas v. DHS/ICE Off. of Chief Couns. - ATD*, No. CV 323-002, 2023 WL 2761710, at *1 (S.D. Ga. Jan. 23, 2023); *see also Wallace v. Sec'y, U.S. Dep't of Homeland Sec.*, 616 F. App'x 958, 961 (11th Cir. 2015).

But § 1252(g) does not cover "all deportation-related claims." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 478 (1999). It has a far narrower reach. It forecloses judicial review of three discrete actions by the Attorney General: her "decision or action to commence proceedings, adjudicate cases, or execute removal orders." *Id.* at 482. As the Supreme Court recently reiterated, § 1252(g) does not "sweep in any claim that can technically be said to arise from the three listed actions." *Jennings*, 583 U.S. at 294. Instead, it "refer[s] to just those three specific actions themselves." *Id.*

3

Banjoko's petition steers clear of those forbidden actions. He is not asking this Court to vacate his removal order or to stop the Government from putting him on a plane. Instead, he is challenging the substantive and procedural mechanics of his current detention. His argument is that the Government failed to follow its own rulebook when it revoked his release. (*See* Doc. 12.) A claim that the Government locked someone up in violation of binding regulations is a challenge to the process of detention, not a challenge to the commencement or execution of a removal order. *See, e.g., Navarro v. Bondi,* No. 8:25-CV-3213-KKM-NHA, 2025 WL 3275944, at *2 (M.D. Fla. Nov. 25, 2025).

The core of this case is not about the Attorney General's decision to detain Banjoko. It's about whether the Government followed the law and its own regulations in that process. (*See* Doc. 1.) Such a claim is best understood as independent of, and collateral to, removal because it may be resolved without affecting the Attorney General's prosecutorial discretion that § 1252(g) was meant to preserve. *See Reno,* 525 U.S. at 485 n.9 ("Section 1252(g) was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion."); *see also Arroyo v. Diaz,* No. 25-62676-CIV, 2026 WL 279656, at *4 (S.D. Fla. Feb. 2, 2026); *Banega v. Noem,* No. 2:25-CV-1152-JES-DNF, 2026 WL 234042, at *2 (M.D. Fla. Jan. 29, 2026).

What is more, if the Government's reading were correct, § 1252(g) would act as a jurisdictional black hole for anyone held in immigration custody. Under its theory, so long as the executive branch points to a final removal order, it could hold a noncitizen indefinitely, ignore its own regulations, or subject the detainee to unconstitutional conditions, all while insisting that federal courts are powerless to intervene. The Supreme Court has never read § 1252(g) so broadly. *See also Arroyo*, 2026 WL 279656, at *4, *Banega*, 2026 WL 234042, at *2.

Next up is 8 U.S.C. § 1252(b)(9)—the so-called "zipper clause"—which "bars review of claims arising from 'action[s]' or 'proceeding[s] brought to remove an alien.'" *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1896, (2020). We need not spend long here. The Eleventh Circuit has held "that the zipper clause only affects cases that involve[] review of an order of removal." *Canal A Media Holding, LLC v. United States Citizenship & Immigr. Servs.*, 964 F.3d 1250, 1257 (11th Cir. 2020). It "is not intended to cut off claims that have a tangential relationship with pending removal proceedings." *Id.* Banjoko is not challenging a removal order. So "the Government's reliance on § 1252(b)(9) is misplaced." *Fernandez-Garcia v. U.S. Att'y Gen.*, No. 1-20-CV-23599-UU, 2021 WL 8821923, at *5 (S.D. Fla. Apr. 15, 2021).

With the jurisdictional roadblocks cleared away, the inquiry turns to the merits. Banjoko presses a mix of substantive, administrative, and

5

procedural challenges to his renewed confinement. Taking those claims one by one reveals that while his broader theories falter, his procedural due process claim has teeth.

### A. Substantive Due Process (Counts I and IV)

In Count I, Banjoko seeks habeas relief on the ground that his detention violates 8 U.S.C. § 1231(a)(6), as interpreted by the Supreme Court in *Zadvydas v. Davis*, 533 U.S. 678 (2001). (Doc. 1 ¶¶ 108-12.) In Count VI, he frames the exact same injury as a violation of his Fifth Amendment substantive due process rights. (*Id.* ¶¶ 151-52.) Because these counts overlap—both attacking the substantive legality of his continued confinement—they are addressed together.

A noncitizen subject to a final order of removal, like Banjoko, has no inherent right to walk free while awaiting deportation. *See* 8 U.S.C. § 1231. "Detention during deportation proceedings," the Supreme Court has explained, is simply "a constitutionally valid aspect of the deportation process." *Demore v. Kim*, 538 U.S. 510, 523 (2003). But there is a catch. Holding an admitted alien indefinitely is also a constitutional non-starter since "the Due Process Clause applies to all persons within the United States." *Zadvydas*, 533 at 693.

To reconcile these points, the Supreme Court in *Zadvydas* capped "an alien's post-removal-period detention to a period reasonably necessary to

6

bring about that alien's removal from the United States." *Id.* at 689. And to give lower courts a workable yardstick, the Court drew a line at six months: any post-removal detention lasting six months or less is "presumptively reasonable." *Id.* To have a substantive due process claim in this context, then, "the alien not only must show post-removal order detention in excess of six months but also must provide evidence of a good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Akinwale v. Ashcroft*, 287 F.3d 1050, 1052 (11th Cir. 2002).

Apply that framework here, and Banjoko's claim immediately runs into a math problem: he has not been detained long enough. ICE grabbed him on December 18, 2025. Because he has been in custody just over three months, he remains squarely within the window in which his detention is presumptively reasonable. *See Guerra-Castro v. Parra*, No. 1:25-CV-22487, 2025 WL 1984300, at *4 (S.D. Fla. July 17, 2025) (finding habeas petition "premature" because "Petitioner has not been detained for more than six months"); *see also Jiang v. Mukasey*, No. 208-CV-773-FTM-29DNF, 2009 WL 260378, at *2 (M.D. Fla. Feb. 3, 2009); *Noel v. Glades Cnty. Sheriff*, No. 2:11-CV-698-FTM-29, 2011 WL 6412425, at *2 (M.D. Fla. Dec. 21, 2011).

To avoid this result, Banjoko argues that the Court should count his prior immigration confinement towards the six-month threshold. (Doc. 12 at 3-4.) Back in 2012 and 2013, he spent roughly nine months in post-removal-

order custody before the Government released him. As he sees it, the *Zadvydas* clock is a cumulative, lifetime timer. Because he already crossed the six-month line over a decade ago, he contends the Government gets no fresh grace period today. Under that logic, his constitutional challenge was ripe the minute ICE took him back into custody. (*Id.*)

District courts are split on whether prior time in ICE custody should be aggregated to satisfy the six-month *Zadvydas* clock. Some have firmly rejected this cumulative approach. They reason that if "detentions [are counted] in the aggregate, any subsequent period of detention, even one day, would raise constitutional concerns." *Barrios v. Ripa*, No. 1:25-CV-22644, 2025 WL 2280485, at *8 (S.D. Fla. Aug. 8, 2025). Because the executive branch is tasked with great deference in effectuating removals, these courts warn that constantly adjudicating the constitutionality of every brief re-detention would improperly obstruct that statutory discretion. *Meskini v. Att'y Gen. of U.S.*, No. 4:14-CV-42 (CDL), 2018 WL 1321576, at *3 (M.D. Ga. Mar. 14, 2018). Under this view, *Zadvydas* does not function as a "Get Out of Jail Free Card that may be redeemed at any time just because an alien was detained too long in the past." *Id.*; *see also Flores-Reyes v. Assistant Field Off. Dir.*, No. 26-CV-20226, 2026 WL 406708, at *2 (S.D. Fla. Feb. 13, 2026).

Conversely, other courts have treated the *Zadvydas* period as cumulative. *Chen v. Holder*, No. CV 6:14-2530, 2015 WL 13236635, at *2

8

(W.D. La. Nov. 20, 2015). This approach is driven by the constitutional imperative to prevent the government from indefinitely detaining noncitizens through a loophole of release and re-detention. *Krechmar v. Parra*, No. 2:25-CV-01095-SPC-DNF, 2025 WL 3620802, at *3 (M.D. Fla. Dec. 15, 2025). To consider only the current, isolated period of confinement—ignoring all prior custody—would allow the government to bypass *Zadvydas* through successive detentions. For these courts, aggregation is the only way to safeguard against the precise danger of indefinite detention that the Supreme Court sought to prevent. *See Rodriguez Romero v. Ladwig*, No. CV 25-1106-JWD-EWD, 2026 WL 321437, at *12 (M.D. La. Feb. 6, 2026).

This Court declines to endorse a blanket rule that all prior periods of confinement automatically aggregate to satisfy the *Zadvydas* six-month clock. Such a categorical approach is practically unworkable and effectively penalizes the government for its past lawful actions. If every prior day spent in immigration custody simply rolled over into the present calculus, the government's statutory authority to briefly re-detain a noncitizen to finalize a removal would be severely restricted, if not eliminated entirely. The six-month period established in *Zadvydas* was designed to provide a functional window to negotiate with foreign nations, secure travel documents, and coordinate the complex logistics of deportation. A strict aggregation rule ignores the reality that diplomatic circumstances evolve. If a foreign

9

government that previously refused repatriation suddenly agrees to issue travel documents, the United States needs a practical opportunity to effectuate that newly viable removal. Mandating an automatic rollover of all past detention would force the immediate release of a noncitizen even when their current custody is driven by an imminent, foreseeable deportation, ultimately frustrating the core purpose of the removal statute.

This approach finds support in both the reasoning of *Zadvydas* and the historical foundations of the vehicle Banjoko employs (habeas corpus). In *Zadvydas*, the Supreme Court eschewed a rigid, mechanical formula, focusing instead on whether the length of detention remains "reasonably necessary to secure removal." 533 U.S. at 699. The Court explicitly instructed lower courts to measure reasonableness in light of the specific circumstances of the case and the actual likelihood of a future deportation. *Id.* ("It should measure reasonableness primarily in terms of the statute's basic purpose, namely, assuring the alien's presence at the moment of removal."). That directive undermines the logic of a blind, automatic aggregation of prior custody days here. *See also Meskini*, 2018 WL 1321576, at *3.

A flexible standard also aligns with the fundamental principle that habeas corpus is "at its core, an equitable remedy." *Munaf v. Geren*, 553 U.S. 674, 693 (2008). Because habeas relief is governed by equitable principles, courts are empowered to look beyond a mere mathematical tally to examine

10

the totality of the circumstances. *Id.*; *see also Duckworth v. Eagan*, 492 U.S. 195, 213 (1989) (O'Connor, J., concurring) ("[T]he Court has long recognized that habeas corpus [is] . . . governed by equitable principles[.]"). By inquiring into whether the government has engaged in a deliberate cycle of release and re-detention, the court exercises its equitable discretion to prevent gamesmanship, all while preserving the executive branch's necessary flexibility to enforce the immigration laws.

Applying this standard here, Banjoko's argument for aggregation falls short. While he points to his prior period of ICE custody, the record is devoid of evidence that immigration officials manipulated his release and re-arrest to bypass the six-month presumption or avoid judicial oversight. Without proof of such tactical maneuvering, this Court treats his present custody as an independent, good-faith endeavor to secure his deportation.

When the Government holds a noncitizen for only a few months to execute a valid removal order, as claimed here, it is not doling out an unconstitutional penalty. It is simply doing what the regulatory scheme authorizes. Because his brief confinement remains firmly tethered to a legitimate, civil immigration purpose, Banjoko's substantive due process claim fails. *See H.N. v. Warden, Stewart Det. Ctr.*, No. 7:21-CV-59-HL-MSH, 2021 WL 4203232, at \*3 (M.D. Ga. Sept. 15, 2021); *Gudino v. Lowe*, No. 1:25-CV-00571, 2026 WL 526366, at \*8 (M.D. Pa. Feb. 25, 2026) ("[T]he length of

11

detention is generally not unreasonable until the noncitizen has been detained for more than six months.").

### B. Administrative Procedure Act (Counts II, III, & V)

Banjoko also tries to attack his detention through the Administrative Procedure Act ("APA"). In Counts II, III, and V, he alleges that the Government's actions were arbitrary, capricious, ultra vires, and contrary to the Constitution. (*See* Doc. 1 at 34-37, 39-40.)

These claims fail from the start. A habeas petition is a unique procedural vehicle governed by its own specialized rules, statutes, and equitable principles. It is not a standard civil complaint. Attempting to wedge APA claims into a habeas petition ignores the distinct procedural architecture of habeas corpus. *See Fleurimond v. Noem*, No. CV-26-00037-PHX-MTL, 2026 WL 507542, at *3 (D. Ariz. Feb. 24, 2026). And litigants cannot sidestep these different rules and procedures by slapping a habeas label on an administrative complaint. *See Alvarez v. Noem*, No. 5:26-CV-0013-JKP, 2026 WL 93972, at *7 (W.D. Tex. Jan. 9, 2026); *Richmond v. Scibana*, 387 F.3d 602, 606 (7th Cir. 2004) (recognizing legal distinction between habeas cases and civil actions brought under APA, which have different filing fees and exhaustion provisions).

More importantly, the APA is a gap-filler. By its own terms, the APA provides for judicial review of final agency actions only when "there is no

other adequate remedy in a court." 5 U.S.C. § 704. Here, there is a perfectly adequate remedy: the writ of habeas corpus. *See Trump v. J.G.G.*, 604 U.S. 670, 674 (2025) (Kavanaugh, J., concurring). Because habeas provides a mechanism to test the legality of Banjoko's detention and the procedures used to effectuate it, the APA claims are improper. *See Fleurimond*, 2026 WL 507542, at *3, *Rivera v. Noem*, No. 1:25-CV-01289 KWR-KBM, 2026 WL 381309, at *7 (D.N.M. Feb. 11, 2026). Counts II, III, and V thus fail.

## C. Procedural Due Process (Count IV)

That leaves Count IV, where Banjoko presses a procedural due process claim. (Doc. 1 ¶¶ 129-38.) The Fifth Amendment prohibits deprivation of an individual's life, liberty, or property without due process of law. U.S. Const. amend. V. "[T]he Due Process Clause applies to all persons within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693. Courts examine procedural due process claims in two steps: the first asks whether there exists a protected liberty interest under the Due Process Clause, and the second examines the procedures necessary to ensure any deprivation of that protected liberty interest accords with the Constitution. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).

The first step is easy. The Court is satisfied that Banjoko enjoyed a protected right to remain free from physical custody. Once ICE unlocked the

13

doors and placed him on supervised release, he acquired a conditional liberty interest that triggered constitutional protection before it could be taken away. *See Young v. Harper*, 520 U.S. 143, 147-48 (1997). This is true even when the released individual is subject to extensive conditions of release. *See Rodriguez Romero*, 2026 WL 321437, at *11 ("[N]on-citizens have an overwhelming liberty interest in their continued release under [an] Order of Supervision . . . that may not be removed without due process."); *see also Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the [Due Process] Clause protects.").

That takes us to the second step: determining exactly what process is due. At its core, the Due Process Clause demands that before the government strips a person of a protected liberty interest, it must provide notice and a meaningful opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). "Due process requires notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010).

According to the unrebutted record here, ICE provided notice of the revocation. (*See* Doc. 9-7.) Banjoko, however, raises a host of objections to that paperwork, anchoring his arguments in the underlying regulations

14

governing the revocation of supervised release. He first claims the notice "identifies no materially changed circumstances" as needed. (Doc. 12 at 4.)

The Government ended Banjoko's supervised release because it intends to deport him. And under 8 C.F.R. § 241.13(i),[2] that is a perfectly valid reason to take him back into custody. The regulation explicitly empowers ICE to revoke supervision "if, on account of changed circumstances, [it] determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." *Id.* § 241.13(i)(2). By launching a renewed diplomatic push to secure travel documents from Nigeria, the Government signaled its intent to finally execute his longstanding removal order. Bringing a noncitizen back into custody to ensure they are actually available for deportation is exactly what the regulation authorizes.

Banjoko's suggestion that the Government was required to describe the "changed circumstances" underlying its decision is a nonstarter. (Doc. 12 at 4.) Section 241.13(i) leaves the determination of whether "circumstances have changed" squarely in ICE's hands. To the extent this Court has any role in questioning that operational judgment, our posture must be highly deferential. As the Supreme Court has cautioned, we "must take appropriate account of the greater-expertise of the Executive Branch, of the serious

---

[2] Because the Government previously released Banjoko after determining that there was no significant likelihood of his removal, the regulation governing his return to custody here is 8 C.F.R. § 241.13(i). *See Choy v. Woosley*, No. 4:25-CV-197-DJH, 2026 WL 324601, at *3 (W.D. Ky. Feb. 6, 2026).

administrative needs and concerns inherent in the necessarily extensive ... efforts to enforce this complex [area law of law], and the Nation's need to speak with one voice in immigration matters." *Zadvydas*, 533 U.S. at 700. So "the Court's review of the respondents' determination that there are changed circumstances in this case is necessarily limited." *Nguyen v. Noem*, 797 F. Supp. 3d 651, 666 (N.D. Tex. 2025).

Viewed through that deferential lens, the Government has done enough. ICE identified a specific operational shift: a renewed diplomatic push to secure travel documents from Nigeria. Banjoko may view those efforts as nothing more than bureaucratic paper-shuffling, unlikely to actually yield a flight home. But § 241.13(i) does not require the Government to guarantee a successful deportation before it can revoke an order of supervision. It merely requires the agency to point to a change in circumstances that justifies bringing a noncitizen back into custody to prepare for removal. *See Tran v. Warden, S. Side Det. Ctr.*, No. 2:25-CV-1224-KCD-NPM, 2026 WL 672969, at *8-9 (M.D. Fla. Mar. 10, 2026). ICE has determined that it can remove Banjoko and documented its decision accordingly. *See Morales Sanchez v. Bondi*, No. 5:25–CV–02530–AB–DTB, 2025 WL 3190816, at *3 (C.D. Cal. Oct. 3, 2025). That kind of executive judgment comes with a presumption of regularity, and Banjoko offers nothing more than his own skepticism to rebut it. Much more is required for this Court to step in and declare ICE's conduct

16

unlawful. *See Lewis v. United States*, 279 U.S. 63, 73 (1929) ("It is the settled general rule that all necessary prerequisites to the validity of official action are presumed to have been complied with, and that where the contrary is asserted it must be affirmatively shown.").

Having failed to show the notice lacked sufficient substance, Banjoko pivots to its timing. He claims that the Government unlawfully "detained first and papered later." (Doc. 12 at 5.) Because his liberty is at stake, he insists the agency's regulations strictly mandate pre-deprivation notice— essentially, a heads-up before taking him back into custody. (*Id.*)

Again, the Court is not convinced. Section 241.13(i) guarantees a noncitizen the opportunity to respond to the reasons for revocation, but it nowhere promises advance warning or a pre-arrest hearing. Executing the arrest first and providing the necessary notice and procedural machinery afterward is entirely consistent with the regulatory text. *See* 8 C.F.R. § 241.13(i)(3) ("*Upon revocation*, the alien will be notified of the reasons for revocation of his or her release." (emphasis added).) And that sequencing is no accident. In the practical reality of immigration enforcement, mailing a noncitizen a formal invitation to their own arrest would virtually guarantee they disappear. To eliminate that flight risk, § 241.13(i)(3) justifiably permits the Government to secure the person first, provided it delivers the necessary notice and an opportunity to be heard after they are detained. Demanding

17

pre-deprivation process here does not just rewrite the regulation; it ignores the operational realities the regulation was designed to navigate. *See, e.g.*, *Grigorian*, 2025 WL 2604573, at \*8.

Section 241.13(i) gives ICE two reasons to revoke an order of supervision: either the noncitizen violated the conditions of his release, or the Government is ready to effectuate removal. 8 C.F.R. § 241.13(i). The written notice handed to Banjoko checked that second box, explicitly stating that his supervision was ending so the agency could execute his final removal order. (Doc. 9-7.) It also confirmed that the agency had made this decision based on a review of his case and the available removal options. That maps perfectly onto the regulation's demands. The notice did not hide the ball—it told Banjoko exactly why his supervised freedom was ending and why he was returning to custody. "There is not much more information a notice could include that would give an alien a more concrete reason for their revocation." *Doe v. Easterwood*, No. 25-CV-196 CJW-KEM, 2025 WL 4093531, at \*6 (N.D. Iowa Dec. 5, 2025); *see also Tran v. Baker*, No. 1:25-CV-01598-JRR, 2025 WL 2085020, at \*4 (D. Md. July 24, 2025). Because the document gave him a clear, concrete rationale to push back against, the Court is satisfied that Banjoko received the notice due process demands.

But notice is only half the due process equation. The other half is the opportunity to be heard. Section 241.13(i) expressly guarantees that an

18

individual facing revocation will receive an "informal interview" to respond to ICE's stated reasons. This is where the Government's procedural machinery breaks down. While ICE successfully handed Banjoko the necessary paperwork, the record is completely devoid of any evidence that it actually gave him the required interview. The Government itself casually concedes in its briefing that it is "unclear" whether this interview ever took place. When physical liberty is on the line, unclear does not cut it. Banjoko was entitled to a mechanism to challenge the revocation of his supervision, and it appears the Government failed to provide it.

Due process is flexible. It "calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). To be sure, Banjoko is a noncitizen subject to a final removal order, meaning he does not possess the full panoply of rights enjoyed by a citizen. But even with that caveat, the Constitution demands more than what has been offered here. The Government half-heartedly suggests that Banjoko will eventually receive a file review where he can present his case. (Doc. 9 at 18.) The Court cannot agree that is sufficient. Taking away a person's liberty and then making him sit in a detention center for several months before even glancing at his paperwork flips the constitutional baseline on its head. As other courts have recognized, a belated review, held more than three months after the jail cell door slams shut, is simply too little, too late to protect the core liberty

19

interest at stake. *See Grigorian*, 2025 WL 2604573, at \*9; *see also United States v. Smith*, 30 F.4th 1334, 1338 (11th Cir. 2022) ("We have said that the complete denial of the opportunity to be heard on a material issue is a violation of due process which is never harmless error[.]").

Banjoko has successfully identified a due process violation. But spotting a procedural foul does not automatically grant him the ultimate prize he seeks: "immediate release." (Doc. 1 at 42.) Habeas corpus is, at its core, governed by equitable principles. *Munaf v. Geren*, 553 U.S. 674, 693 (2008). And equity counsels against the drastic remedy of immediate release here for a couple of reasons. *Id.* ("The question, therefore, even where a habeas court has the power to issue the writ, is whether this be a case in which [that power] ought to be exercised.").

First, the natural remedy for a procedural shortcoming is a procedural fix. When an agency skips a step in its own rulebook, the typical judicial response is to force the agency to go back and do its job right—not to throw open the jailhouse doors. *See, e.g.*, *Msezane v. Gartland*, No. 5:19-CV-51, 2020 WL 1042293, at \*7 (S.D. Ga. Jan. 29, 2020) ("Critically, the Eleventh Circuit explained in the context of prolonged § 1226(c) detention, procedural due process does not require automatic release of a criminal alien once the detention is unreasonably prolonged but, instead, requires the government to afford the alien an individualized bond inquiry."). The specific injury Banjoko

20

suffered here is the deprivation of an informal interview under § 241.13(i). The logical cure, therefore, is to order exactly that. Granting a substantive windfall like immediate release for a purely procedural error overreaches. *See Nguyen v. Noem*, 797 F. Supp. 3d 651, 663–64 (N.D. Tex. 2025) ("The Supreme Court [has] made clear that error regarding one's confinement does not mean that release is the appropriate remedy.").

Second, the writ of habeas corpus is fundamentally forward-looking. It asks whether a petitioner's confinement is lawful today and whether it can lawfully continue tomorrow. *See Walker v. Wainwright*, 390 U.S. 335, 336 (1968) ("[T]he great and central office of the writ of habeas corpus is to test the legality of the prisoner's current detention."). A straightforward fix can easily restore Banjoko's detention into constitutional compliance. Until ICE proves unwilling or unable to provide the process its regulations require, tearing up the detention order is simply premature. In the Court's view, the proper move is to hold the agency to its own rules, test whether it can cure the defect, and reserve the drastic remedy of release for a true failure to comply. To that end, the Government must provide the required interview under 8 C.F.R. § 241.13(i)(3) by April 3, 2026.

One last issue. In the event of his release, Banjoko seeks an order prohibiting his future detention unless ICE complies with its regulations. (Doc. 1 at 43.) That request invites a ruling on a purely hypothetical scenario.

21

Federal courts do not deal in advisory opinions about what might happen down the road. *See, e.g.*, *Lin v. Lynch*, No. CV 15-6520-DSF (JPR), 2016 WL 1253265, at *2 (C.D. Cal. Mar. 7, 2016). It is entirely speculative whether Banjoko will be released, let alone whether the Government will try to take him back into custody at some later date. Until ICE actually attempts to detain him again, any challenge to that future confinement is simply unripe. Dealing with tomorrow's potential procedural fouls will have to wait. *See Woodley v. Holder*, No. 4:10-CV-98-CDL-MSH, 2010 WL 5553987, at *1 n.1 (M.D. Ga. Dec. 6, 2010) ("The Court cannot rule on issues that are not currently ripe, such as a potential future violation of Petitioner's rights.").

### III. Conclusion

The Government lawfully revoked Banjoko's supervision to prepare for his removal, and the notice it handed him cleared both regulatory and constitutional hurdles. But ICE provided no mechanism to contest the revocation as constitutionally required by the Due Process Clause. The fix for that failure, however, is straightforward: provide the missing process. Throwing open the jailhouse doors is a bridge too far. Accordingly,

1.    Bajoko's Petition for Writ of Habeas Corpus (Doc. 1) is **GRANTED IN PART** and **DENIED IN PART**.

2.    To the extent Banjoko seeks immediate release from ICE custody, the petition is **DENIED**.

3.      To the extent Banjoko seeks a procedural remedy for the revocation of his supervised release, the petition is **GRANTED**.

4.      Respondents are **ORDERED** to provide Banjoko with the informal interview required by 8 C.F.R. § 241.13(i)(3) by **April 3, 2026**. If that procedure is not provided by the Court's deadline, Respondents are directed to release Banjoko.

5.      The Clerk is directed to enter judgment accordingly and close the case. The Court will retain jurisdiction to enforce this Order.

**ORDERED** in Fort Myers, Florida on March 19, 2026.


Kyle C. Dudek
United States District Judge